### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO
### Judge William J. Martínez

Civil Action No. 11-cv-03143-WJM-KMT

JTS CHOICE ENTERPRISES, INC.,

    Plaintiff,

v.

E.I. DUPONT DE NEMOURS AND COMPANY,
METRO PAINT SUPPLIES, INC., and
AUTOMOTIVE COATINGS & EQUIPMENT, LLC,

    Defendants.

---

## ORDER DENYING MOTIONS TO DISMISS

---

Plaintiff JTS Choice Enterprises ("Plaintiff" or "Choice") brings this action against Defendant E.I. Dupont De Nemours and Company ("Dupont"), Metro Paint Supplies, Inc. ("Metro"), and Automotive Coatings & Equipment, LLC ("ACS") alleging anti-competitive actions in violation of the Sherman Act, 15 U.S.C. §§ 1 *et seq.*, and other federal and state laws. (Am. Compl. (ECF No. 74) pp. 14-37.)

Before the Court are the following Motions: (1) Dupont's Motion to Dismiss for Lack of Subject Matter Jurisdiction (ECF No. 79[1]), which was joined by Metro (ECF No. 15); (2) Metro's Motion to Dismiss for Lack of Personal Jurisdiction (ECF No. 80[2]); and

---

[1] DuPont originally filed its Motion to Dismiss as ECF No. 14. However, when Plaintiff filed an Amended Complaint, the Court denied the original Motion to Dismiss and DuPont re-filed it as pertinent to the Amended Complaint. (ECF No. 79.)

[2] Metro originally moved to dismiss Plaintiff's original complaint at ECF No. 15. However, when Plaintiff filed an Amended Complaint, the Court denied the original Motion and Metro reasserted its argument in opposition to the Amended Complaint. (ECF No. 80.)

(3) Plaintiff's Motion to Strike Portions of the Affidavit of John Gardner (ECF No. 75).

## I. FACTUAL BACKGROUND

Plaintiff is a Colorado corporation co-owned by Joseph and Stephen Schweid. (ECF Nos. 37-1 & 37-4.) Since 1987, Plaintiff has been in the business of selling automotive coatings to auto body repair shops and retailers in the Denver area on behalf of DuPont. (Am. Compl. ¶ 14; ECF No. 37-1 ¶ 4.) Dealers of DuPont automotive coatings such as Plaintiff are commonly referred to in the industry as "jobbers". (*Id.*) Metro is a DuPont jobber based in Illinois and who services the Midwestern market. (*Id.* ¶ 11; Weiss Decl. (ECF No. 70-1) ¶ 4.)

Before March 2009, Plaintiff's primary competitor in the Denver market was Denver Car Color ("DCC"). (Am. Compl. ¶ 14.) In March 2009, ACS—a subsidiary of Metro—acquired DCC. (*Id.* ¶ 28.) Shortly after this transaction, Metro issued a press release stating: "Metro Paint Supplies, Inc. has merged with Denver Car Color in Denver, Colorado . . ." (ECF No. 35-2.) This press release touted Metro's experience in the industry and the fact that Metro is "the largest Standox distributed in North America" and referred readers to Metro's website: "www.metropaint.com". (*Id.*) At the time[3], Metro's website stated that its corporate headquarters were in Illinois, that it had three locations in Illinois, and that there were two locations in Colorado—one in Denver and one in Colorado Springs. (ECF No. 35-2.) Neither the press release nor the website included any mention of ACS.

---

[3] It appears that Metro has since altered its website to clarify that its locations in Colorado are operated by ACS rather than Metro. *See* www.metropaint.com (Accessed January 14, 2013.)

Metro also distributed mock-up of potential fliers to Plaintiff's customers in an attempt to get them to change from Plaintiff to Metro/ACS[4]. These fliers stated that they were "Created by Metro Paint Supplies" and referred to Metro's website. (ECF No. 35-2.) Brochures that touted Metro's "network of stores in Colorado and Illinois" were also distributed to Plaintiff's customers. (*Id.*) Invoices submitted by Metro/ACS to its customers in Colorado had the "MPS" logo on the header. (ECF No. 35-2.) Metro/ACS also sponsored clinics in the Denver area in summer and fall of 2009 which were marketed as produced by Metro. (*Id.*) The contact information for these clinics was Metro's Illinois office. (*Id.*)

Within four months of Metro/ACS purchasing DCC, Plaintiff allegedly began losing customers. (Am. Compl. ¶ 30.) Plaintiff asked DuPont to intervene to stop Metro/ACS from poaching its customers, but DuPont declined. (*Id*. ¶¶ 32-37.) The particular steps taken by Plaintiff and DuPont related to this loss of business are detailed in the Amended Complaint but are not set forth herein because they are not material to the Court's resolution of the instant Motions.

On June 20, 2011, Plaintiff entered into an asset sale with National Coating and Supplies ("National"). (ECF No. 58-1.) The sale closed on June 22, 2011. (ECF No. 37-1 ¶ 2.) The documents that consummated the sale were an Asset Purchase Agreement ("Purchase Agreement") and a Bill of Sale ("BOS"). (ECF No. 58-1.) These documents were negotiated during a series of face-to-face meetings between Stephen and Joseph Schweid on behalf of Plaintiff, and Wayne Lavrack, John Gardner, and

---

[4] Because it is unclear from the record whether many of these actions were taken by Metro or ACS, where appropriate, the Court will refer to the two jointly as "Metro/ACS".

Dennis Fox on behalf of National. (ECF No. 130-1 ¶ 4.) The relevant details of the Purchase Agreement and the BOS will be discussed as necessary below.

On December 2, 2011, Plaintiff initiated this action against DuPont and Metro. (ECF No. 1.) Plaintiff later filed an Amended Complaint which also named ACS as a Defendant. (ECF No. 74.)

## II.   MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

Defendants move to dismiss this action for lack of subject matter jurisdiction based on Plaintiff's sale of its business to National Coatings and Supplies, Inc. (ECF Nos. 14 & 79.) For the reasons that follow, this Motion is denied.

### A.   Legal Standard

Rule 12(b)(1) empowers a court to dismiss a complaint for "lack of jurisdiction over the subject matter." Fed. R. Civ. P. 12(b)(1). Dismissal under Rule 12(b)(1) is not a judgment on the merits of a plaintiff's case. Rather, it calls for a determination that the court lacks authority to adjudicate the matter, attacking the existence of jurisdiction rather than the allegations of the complaint. *See Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994) (recognizing federal courts are courts of limited jurisdiction and may only exercise jurisdiction when specifically authorized to do so).

A Rule 12(b)(1) motion to dismiss "must be determined from the allegations of fact in the complaint, without regard to mere conclusory allegations of jurisdiction." *Groundhog v. Keeler*, 442 F.2d 674, 677 (10th Cir. 1971). When considering a Rule 12(b)(1) motion, however, the court may consider matters outside the pleadings without transforming the motion into one for summary judgment. *Holt v. United States*, 46 F.3d

1000, 1003 (10th Cir. 1995). Where a party challenges the facts upon which subject matter jurisdiction depends, a district court may not presume the truthfulness of the complaint's "factual allegations . . . [and] has wide discretion to allow affidavits, other documents, and [may even hold] a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1)." *Id*.

The burden of establishing subject matter jurisdiction is on the party asserting jurisdiction. *Basso v. Utah Power & Light Co.*, 495 F.2d 906, 909 (10th Cir. 1974). A court lacking jurisdiction "must dismiss the cause at any stage of the proceeding in which it becomes apparent that jurisdiction is lacking." *See Basso*, 495 F.2d at 909.

**B.   Analysis**

Defendants contend that this Court lacks subject matter jurisdiction over this action because Plaintiff assigned its right to pursue the claims at issue here to National when it executed the Purchase Agreement. Plaintiff argues that did not assign the rights to bring this action to National as part of the transaction and, therefore, that it retains the right to bring this case.

Colorado law[5] provides that "[n]o particular formalities are necessary to effect a valid assignment. However, the intent to make the assignment must be apparent, and

---

[5] Plaintiff contends that a different standard applies to the assignment of federal anti-trust claims such as those at issue in this case. (ECF No. 37 at 6-9.) However, the authorities cited by Plaintiff in support of this contention are not binding and the Tenth Circuit has never held that a different standard applies to assignment of anti-trust claims than applies to all other claims. Therefore, the Court's analysis will focus on Colorado law and whether there was a valid assignment of Plaintiff's right to bring this action. For purposes of the record, however, the Court notes that the result would be the same if the Court applied the authorities cited by Plaintiff. That is, were the Court to adopt the reasoning of the Third Circuit in *Gulfstream Associates, Inc. v. Gulfstream Aerospace Corporation*, 995 F.2d 425 (3d Cir. 1993), it would likewise hold that Plaintiff did not assign its right to bring this action to National because there was no explicit assignment of anti-trust claims in the Purchase Agreement or the BOS.

that intent may be reflected by the written instruments executed by the parties or inferred from the acts and conduct of the assignor." *Phoenix Capital, Inc. v. Dowell*, 176 P.3d 835, 845 (Colo. App. 2007).

DuPont argues that Plaintiff's intent to assign its claims is apparent from the Purchase Agreement because it states that Plaintiff sells "all assets" and all "intangible rights and property" to National. (ECF No. 58 at 3-4 (citing APA ¶¶ 1, 1(f)).) Plaintiff responds by pointing out that the Purchase Agreement is silent as to Plaintiff's legal rights and claims and citing the portions of the Purchase Agreement in which it retains certain legal rights, such as the right to bring actions against certain entities that owe money to Plaintiff. (ECF No. 37 at 10 (citing APA ¶ 3(a)(I)).)

Having reviewed the Purchase Agreement, the Court finds that it is ambiguous as to whether Plaintiff assigned its right to the legal claims at issue in this case to National. It is undisputed that neither the Purchase Agreement nor the BOS expressly address Plaintiff's anti-trust claims or any of the other legal claims brought by Plaintiff in this case. While the Purchase Agreement generally states that Plaintiff sells "all assets", other provisions of the Purchase Agreement expressly allow Plaintiff to retain various assets. Generally, the more specific provisions of a contract prevail over more general provisions. *Level 3 Commc'ns, LLC v. Liebert Corp.*, 535 F.3d 1146, 1154 (10th Cir. 2008). Given these incompatible provisions in the Purchase Agreement, and the fact that there is no explicit mention of the legal claims at issue here, the Court finds that the Purchase Agreement and BOS could reasonably be interpreted to both assign to National—and to not assign to National—Plaintiff's legal rights to bring this action. Therefore, the Purchase Agreement is ambiguous. *Ad Two, Inc. v. City and Cty. of*

6

*Denver*, 9 P.3d 373, 376 (Colo. 2000) (when a contractual provision could reasonably be interpreted in more than one way, it is ambiguous).

When a court has found that a contract is ambiguous, it may consider extrinsic evidence to discern the intent of the parties. *East Ridge of Fort Collins, LLC v. Larimer and Weld Irrigation Co.*, 109 P.3d 969, 974 (Colo. 2005). "This extrinsic evidence may include any pertinent circumstances attendant upon the transaction, including the conduct of the parties under the agreement." *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1314 (Colo. 1984). Courts in Colorado "have found the conduct of the parties before the controversy arose to be a reliable test of their interpretation of the agreement." *East Ridge*, 109 P.3d at 975.

As extrinsic evidence in support of its position, DuPont has submitted the affidavit of John Gardner[6], who is a Senior Vice President with National and who participated in the negotiation of the Purchase Agreement and BOS. Mr. Gardner states that National intended to purchase all assets other than those explicitly exempted in the Purchase Agreement. (Gardner Aff. ¶ 4.) However, Mr. Gardner's affidavit shows only that it was his belief that National intended to purchase all assets. Affidavits submitted by the Plaintiff indicate that a number of individuals other than Mr. Gardner—and who outranked Mr. Gardner in National's corporate structure—were involved in negotiating the Purchase Agreement and BOS on behalf of National. (ECF

---

[6] Plaintiff moves to strike portions of Mr. Gardner's affidavit which Plaintiff contends are not based on Mr. Gardner's personal knowledge. (ECF No. 79.) The Court finds that it need not resolve the merits of the Motion to Strike because, even if the Court considers all of Mr. Gardner's affidavit, it still concludes that Plaintiff did not intend to assign its claims to National. Accordingly, the Court DENIES Plaintiff's Motion to Strike.

No. 130-1 ¶ 5.) There is no evidence before the Court as to what their understanding of National's intent was.

On the other hand, Plaintiff has submitted affidavits from its two principals, Stephen and Joseph Schweid. (ECF Nos. 37-1 & 37-4.) Both Stephen and Joseph Schweid state that, in selling their business to National, they did not intend to sell any rights to pursue legal claims of any nature. (ECF No. 37-1 ¶ 10; 37-4 ¶ 3.) Overall, the Court finds that the evidence related to the parties' intent tends to show that Plaintiff did not intend to assign its right to bring the claims at issue in this case to National.

Again relying upon Mr. Gardner's affidavit, Defendants argue that there was no way that National could have explicitly referenced the legal right to bring this litigation in the Purchase Agreement and BOS because National was unaware of these claims before this action was commenced. (Gardner Aff. ¶ 7.) However, Mr. Gardner's affidavit establishes only that Mr. Gardner was not aware of the facts underlying this lawsuit and/or Plaintiff's belief that DuPont and Metro had violated anti-trust laws. Joseph Schweid's affidavit states that he extensively discussed the facts underlying this lawsuit with National's President, Wayne Lavrack, amongst others. (ECF No. 130-1 ¶¶ 8-13.) Mr. Schweid also represents that he specifically told Mr. Lavrack of his intent to pursue this action and that Mr. Lavrack "told me that he hoped we did sue DuPont to teach it a lesson about favoring some jobbers over others." (*Id*. ¶ 18.)

This evidence shows that at least some individuals at National had knowledge of the facts underlying this action before execution of the Purchase Agreement but did not insist that the rights to bring this action be assigned to National. In fact, Mr. Lavrack's statements to Mr. Schweid suggest that National's President understood that Plaintiff

would retain the right to bring these claims against DuPont.

Finally, the Court finds that the Plaintiff's and National's actions since the sale of the business show that they did not understand the Purchase Agreement or BOS to assign all of Plaintiff's legal claims to National.  For example, the terms of the BOS permit Plaintiff to retain the right to bring a collection action against one of its former customers, Phil Long Collision Center, Inc.  (BOS Ex. A.)  But after the BOS was executed, Plaintiff brought a lawsuit against not only Phil Long Collision Centers, Inc., but also PPG, and Single Source (another automotive coating supplier and jobber) alleging, in part, that PPG and Single Source intentionally interfered with Plaintiff's contractual relationship with Phil Long.  (ECF No. 130-2.)  The right to bring this action—which is not a collection action—was not specifically reserved in either the Purchase Agreement or the BOS, yet there has been no challenge to Plaintiff's standing to bring that action.  This course of conduct is further evidence that, in executing the Purchase Agreement and BOS, the parties did not intend to assign all of Plaintiff's legal claims to National.

In sum, the Court finds that the extrinsic evidence shows that Plaintiff did not intend to assign its right to bring the claims at issue in this case to National by way of the Purchase Agreement or the BOS.  Accordingly, the Court concludes that Plaintiff has standing to bring this action and Defendants' Motion to Dismiss for lack of subject matter jurisdiction is denied.

### III.  MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION

In a separate Motion to Dismiss, Metro argues that all claims against it should be dismissed for lack of personal jurisdiction.  (ECF Nos. 15 & 80.)  For the reasons set

forth below, the Court denies this Motion.

### A.     Legal Standard

The purpose of a motion to dismiss pursuant to Rule 12(b)(2) is to test whether the Court has personal jurisdiction over the named parties. Plaintiff bears the burden of establishing personal jurisdiction over all of the Defendants. *Behagen v. Amateur Basketball Ass'n*, 744 F.2d 731, 733 (10th Cir. 1984). When the district court does not hold an evidentiary hearing before ruling on jurisdiction, "the plaintiff need only make a *prima facie* showing of personal jurisdiction to defeat the motion" to dismiss. *Id.* (citing *Kuenzle v. HTM Sport-Und Freizeitgeräte AG*, 102 F.3d 453, 456 (10th Cir. 1996)). A *prima facie* showing exists where the plaintiff raises a reasonable inference that the court has jurisdiction over the defendant. *First Horizon Merchant Services, Inc. v. WellSpring Capital Mgmt., LLC*, 166 P.3d 166, 173 (Colo. App. 2007).

In making this showing, "'[t]he allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits.'" *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995) (quoting *Doe v. Nat'l Med. Servs.*, 974 F.2d 143, 145 (10th Cir. 1992)); *see also Dudnikov v. Chalk & Vermilion Fine Arts*, 514 F.3d 1063, 1070 (10th Cir. 2008) (stating that on *de novo* review, the Tenth Circuit must "tak[e] as true all well-pled (that is, plausible, non-conclusory, and non-speculative . . . ) facts alleged in plaintiffs' complaint."). The plaintiff may buttress these allegations by alleging facts, in affidavit or other written form, that support a finding of jurisdiction. *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998). "If the parties present conflicting affidavits, all factual disputes must be resolved in the

plaintiff's favor, and 'the plaintiff's *prima facie* showing is sufficient notwithstanding the contrary presentation by the moving party.'" *Wenz*, 55 F.3d at 1505; *see also Dudnikov*, 514 F.3d at 1070 ("[A]ny factual disputes in the parties' affidavits must be resolved in plaintiffs' favor.").

To defeat plaintiffs' *prima facie* showing, a defendant must "present a compelling case demonstrating 'that the presence of some other considerations would render jurisdiction unreasonable.'" *OMI Holdings*, 149 F.3d at 1091 (quoting *Burger King Corp. v. Rudzewica*, 471 U.S. 462, 477 (1984)).

**B.     Analysis**

Personal jurisdiction requires the plaintiff to show that jurisdiction is proper "under the laws of the forum state and that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment." *Benton v. Cameco Corp.*, 375 F.3d 1070, 1075 (10th Cir. 2004). "'Colorado's long arm statute is coextensive with constitutional limitations imposed by the due process clause. Therefore, if jurisdiction is consistent with the due process clause, Colorado's long arm statute authorizes jurisdiction over a nonresident defendant.'" *Id*. (quoting *Day v. Snowmass Stables, Inc.*, 810 F. Supp. 289, 291 (D. Colo. 1993)).

Under the due process clause, a "personal jurisdiction analysis involves a two-step inquiry." *AST Sports Sci., Inc. v. CLF Distrib. Ltd.*, 514 F.3d 1054, 1057 (10th Cir. 2008). First, the Court must "ask whether the nonresident defendant has 'minimum contacts' with the forum state such 'that he should reasonably anticipate being haled into court there.'" *Id*. (quoting *World-Wide Volkswagon Corp. v. Woodson*, 444 U.S.

286, 297 (1980)).  Second, if the defendant has sufficient minimum contacts with the forum state, the Court "must then consider whether the exercise of personal jurisdiction over the defendant offends 'traditional notions of fair play and substantial justice.'" *OMI Holdings*, 149 F.3d at 1091 (quoting *Asahi Metal Indus. Co. v. Superior Court of Cal.*, 480 U.S. 102, 109 (1987)).

Having reviewed the allegations contained in Plaintiff's Amended Complaint and the affidavits submitted by Plaintiff in opposition to the Motion to Dismiss, the Court finds that Plaintiff has made out a *prima facie* case of personal jurisdiction over Metro.[7] For the Court to have specific jurisdiction over Metro, Plaintiff must present facts showing that Metro "purposefully directed" its activities at Colorado and that this litigation arises out of or relates to the actions that were directed towards Colorado. *See Burger King*, 471 U.S. at 472.

At its heart, this case is about DuPont encouraging or, at a minimum, allowing Metro and/or ACS to solicit Plaintiff's customers.  Plaintiff has alleged that Metro sent marketing materials and employees to Colorado for the very purpose of soliciting Plaintiff's customers.  (ECF No. 35-1 ¶¶ 4-5, 7-8; ECF No. 35-2 at 2-4.)  For at least some period of time, Metro's website advertised two locations in Colorado.  (ECF No. 35-2 at 6.)  Plaintiff has put forth evidence showing that seminars marketed and hosted by Metro were presented in Colorado.  (ECF No. 35-2 at 24-28.)  This evidence shows that Metro "purposefully directed" its activities at Colorado businesses and residents

---

[7] While Plaintiff argues that the Court has both specific and general jurisdiction over Metro, because the Court finds that it has specific jurisdiction over Metro, it need not address Plaintiff's argument as to general jurisdiction.

and this litigation arises, in part, out of these activities.

Additionally, the Court finds that the actions attributed to Metro and its employees are such that subjecting Metro to litigation in Colorado does not offend traditional notions of fair play and substantial justice. *See Asahi*, 480 U.S. at 109. Metro sent its employees to Colorado for the purpose of conducting business. It posted Colorado locations on its website. It actively solicited sales from businesses operating in Colorado. In doing so, it should have reasonably known that it could be subject to litigation arising out of these actions. *See World-Wide Volkswagon*, 444 U.S. at 297.

Metro contends that all of the actions which Plaintiff attributes to Metro were actually performed by ACS. (ECF No. 70 at 4-5.) Metro contends that ACS is a completely separate business entity and that Metro is not subject to personal jurisdiction in Colorado based on the actions of ACS and its employees. (*Id.*) Metro acknowledges that its employees were sent to Colorado for the purpose of doing business in Colorado but contends that, when its employees were in Colorado, they were doing the business of ACS and not acting on behalf of Metro. (*Id.*) Metro contends that any confusion about whether Metro purchased DCC was inadvertent and that the failure to mention ACS in any of the marketing material was a mistake. (*Id.*)

Even assuming all of these contentions are true, which would require that the Court disregard its obligation to view contested facts in the light most favorable to Plaintiff, the Court will still have personal jurisdiction over Metro at this stage of the litigation under an agency or alter ego theory. "[F]ederal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily be subject to

13

personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court." *Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 653 (5th Cir. 2002).  Where a subsidiary of a corporation may be said to be "doing the business of the parent" corporation in a particular state, the parent corporation may be subject to personal jurisdiction in that state.  *Quarles v. Fuqua Indus., Inc.*, 504 F.2d 1358, 1364 (10th Cir. 1974).

ACS has not moved to dismiss the claims against it based on personal jurisdiction and, as an LLC with two locations in Colorado, any such argument would be absurd.  Thus, this Court has personal jurisdiction over Metro if Plaintiff has made out a *prima facie* case that ACS was doing the business of Metro when it operates in Colorado.  The Court finds that the evidence in the record meets this standard.  It is undisputed that ACS is a subsidiary of Metro that was created for the purpose of segregating Metro's business in the Midwest from ACS's Colorado dealings.  (ECF No. 70-1.)  Metro and ACS have common ownership, "share" marketing materials, including the website www.metropaint.com, and have a number of the same employees.  (*Id*. ¶¶ 11-12.)  ACS does business in Colorado under the name "Metro Paint Supplies of Colorado, LLC".  (*Id*. ¶ 8.)  ACS's invoices bear the insignia of Metro.  (ECF No. 35-2 at 30.)

The Court finds that this is sufficient evidence to show that Metro has a degree of control over ACS so as to permit the Court to exercise jurisdiction over Metro.  *See First Horizon Merchant Servs. v. Wellspring Capital Mgmt, LLC*, 166 P.3d 166, 177-78

(Colo. App. 2007) (where plaintiff has established a *prima facie* case showing that the parent exercises sufficient control over the subsidiary, personal jurisdiction over the parent is appropriate). Accordingly, under either an agency or alter ego theory, the Court finds that it has personal jurisdiction over Metro and Metro's Motion to Dismiss is denied.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. DuPont's Motion to Dismiss for lack of subject matter jurisdiction (ECF No. 79) is DENIED;

2. Metro's Motion to Dismiss for lack of personal jurisdiction (ECF No. 80) is DENIED; and

3. Plaintiff's Motion to Strike (ECF No. 75) is DENIED.

Dated this 15th day of January, 2013.

BY THE COURT:

_____
William J. Martinez
United States District Judge