**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 11-cv-03143-WJM-KMT

JTS CHOICE ENTERPRISES, INC.,

      Plaintiff,

v.

E.I. DUPONT DE NEMOURS AND COMPANY,

      Defendant.

---

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

---

      Plaintiff JTS Choice Enterprises ("Plaintiff" or "Choice") brings this action against

Defendant E.I. DuPont De Nemours and Company[1] ("Defendant" or "DuPont") alleging

that Defendant engaged in anticompetitive actions that violated various federal and

state laws.  (Sec. Am. Compl. (ECF No. 100) ("SAC") pp. 17-28.)  Before the Court are

Defendant's Motion for Summary Judgment (ECF No. 348) and Plaintiff's Motion for

Partial Summary Judgment (ECF No. 350).  For the reasons set forth below,

Defendant's Motion is granted, and Plaintiff's motion is denied.

**I.  LEGAL STANDARD**

      Summary judgment is appropriate only if there is no genuine issue of material

fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem*

---

[1] Plaintiff also originally named Metro Paint Supplies, Inc. and Automotive Coatings & Equipment LLC as Defendants, but the claims against these entities were previously dismissed based on the parties' settlement.  (ECF Nos. 100 & 357.)

*Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248-49 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132 (10th Cir. 2000); *Carey v. U.S. Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987).

A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party. *Anderson*, 477 U.S. at 248. The Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. FACTUAL AND PROCEDURAL BACKGROUND

Defendant DuPont manufactures coatings used to repaint automobiles. (SAC ¶ 8.) DuPont sells paint products to distributors—called "Jobbers"—who then resell the products to auto body repair shops. (*Id*.) Plaintiff Choice was a Jobber for DuPont in the Colorado market from 1991 until 2011. (Fallows Dep. (ECF No. 350-1) pp. 34-35.)

DuPont competes with a number of other manufacturers in the Colorado market, including PPG, BASF, Valspar, Sikkens, and Sherwin Williams. (SAC ¶ 18.) In 2006, DuPont had about one-third of the market, with these competitors taking the other two-thirds of the sales. (*Id*.) In 2008, DuPont's market share decreased to under twenty percent, but it rebounded in 2009 to about one-quarter. (Small Decl. (ECF No. 347-5) ¶¶ 7-8.)

2

Since 2006, DuPont has operated a loyalty-based rewards program for its Jobbers called the "Champion Program" (the "Program"). (Small Dep. (ECF No. 347-2) p. 35.) Jobbers whose liquid paint sales are comprised of more than 60% DuPont products are eligible to participate in the Program. (*Id*. at 35.) DuPont permitted Jobbers who sold a competitor's products before the Program began to continue to do so, but if other Jobbers began selling a competitor's product line, DuPont had the right to terminate them from the Program. (*Id*. at 39-40.) As part of the Program, Jobbers were able to gain "Empowerment Dollars", which could be used to garner new business or retain existing business by offering discounts and incentives to customers. (ECF No. 347-11 at 13.) The amount of Empowerment Dollars earned by a Jobber was based on the Jobber's sale of DuPont automotive coatings. (Small Dep. at 35-46.)

Jobbers who participated in the Program were required to sign a yearly contract with DuPont. (*Id*. at 82-83.) The Program contract prohibited Jobbers from actively soliciting existing business from another DuPont Jobber or attempting to transfer business from another DuPont Jobber. (ECF No. 350-11.) In the event DuPont determined that a Jobber had "poached" business from another DuPont Jobber, the offending Jobber would have its growth calculation (used to determine the amount of Empowerment Dollars awarded) reduced by the value of the transferred account. (*Id*.) The Program contract granted DuPont the right to freeze a Jobber's Empowerment Dollars account, reduce the amount of Empowerment Dollars in an account, and even terminate a Jobber from the Program. (Small Dep. at 58-59; *see also* ECF No. 350-11.)

In 2007, DuPont's three primary Jobbers in the Denver market were Choice, Finish Master, Inc., and Denver Car Color ("DCC"). (J. Schweid Dep. (ECF No. 347-4)

3

p. 53.)  Choice was DuPont's largest distributor in Colorado, and the only DuPont Jobber in Colorado that carried all of DuPont's paint lines.  (S. Schweid 30(b)(6) Dep. (ECF No. 347-6) pp. 24-25.)

In March 2008, DCC contacted DuPont's regional manager seeking assistance in finding a purchaser for DCC.  (Miller Dep. (ECF No. 347-20) p. 137.)  Metro Paint Supplies, Inc. ("Metro") is a top selling DuPont Jobber that, at the time, was operating only in Illinois.  (Weiss Dep. (ECF No. 350-8) pp. 15-19.)  In June 2008, after exploring the possibility of a number of other companies buying DCC, DuPont introduced Metro's owners to DCC.  (ECF No. 350-26.)

DuPont's management was in favor of Metro acquiring DCC because Metro had shown itself to be aggressive in the Illinois market.  (Hall Dep. (ECF No. 350-17) pp. 97-100.)  At this time, DuPont's share of the Denver market was around 20%, while nationally it averaged closer to 30-32%.  (Miller Dep. at 151.)  DuPont was also in the process of terminating its distribution relationship with Finish Master, which was the second largest Jobber in Colorado.  (*Id*. at 152-53.)  DuPont felt that it needed to get a distributor into Denver that was going to help it grow the market share that it felt it deserved, and believed that Metro was a good candidate to achieve this goal.  (*Id*. at 151.)

In order to finance Metro's acquisition of DCC, DuPont guaranteed a loan from Sun Trust Bank to Metro in the amount of $1,600,000.  (ECF No. 350-37.)  DuPont also agreed to credit Metro $12,500 per quarter if Metro met certain sales expectations, and to provide $500,000 in free product to help facilitate Metro's entrance into the Colorado market.  (*Id*.)  Finally, DuPont "front-loaded" DCC's Empowerment Dollars for the entire

year of 2009, which amounted to about $300,000, and gave them to Metro; this was in addition to Metro's own Empowerment Dollars that it earned during this period.  (Small Dep. at 74-79.)

Metro finalized its acquisition of DCC on March 30, 2009.  (ECF No. 347-24.) Choice was not informed of this acquisition before it occurred, and was never told the details of how DuPont had assisted with the financing.  (Fallows Dep. (ECF No. 350-2) pp. 66-68, 208-211.)  At the time of this acquisition, Kevin Fallows and Rene Garcia were DuPont's district managers with oversight of the Colorado market.  (Small Dep. at 81.)  When Choice expressed concern about Metro entering the market, Messrs. Fallows and Garcia assured Choice that they would do everything in their power to ensure that Metro played fair.  (Fallows Dep. at 66-68; Garcia Dep. (ECF No. 350-25) p. 92.)

Despite these promises, Metro began soliciting Choice's customers as soon as it entered the Colorado market.  (ECF No. 350 ¶ 60.)  Metro worked to drive a wedge between Choice and its customers, and to preoccupy Choice with having to defend its existing accounts so that it could not compete with Metro in soliciting new customers. (Roewer Dep. (ECF No. 350-7) pp. 196-98, 259-63.)  Metro offered discounts to customers that ranged around 35%, while Choice was only offering between 10-17%. (Cutherbertson Dep. (ECF No. 350-3) p. 325-26.)  Over the next two years, Choice lost six accounts to Metro.  (ECF No. 350 ¶ 98.)

Choice repeatedly contacted Messrs. Fallows and Garcia about Metro's actions and warned them that Metro would ultimately drive Choice out of business.  (ECF Nos. 350-48–350-51; Fallow Dep. at 343-44.)   When Choice asked how Metro could afford

to offer such steep discounts, Fallows said that he had no idea where Metro was getting the money.  (Fallows Dep. at 215-16.)  Fallows and Garcia repeatedly assured Choice that they were taking the complaints against Metro seriously and were attempting to stop Metro from soliciting Choice's accounts.  On several occasions, they assured Choice that the problem had been fixed.  (ECF Nos. 350-46–350-49; Cutherbertson Dep. at 209; Fallows Dep. at 340.)

In fact, DuPont repeatedly contacted Metro about its business practice of soliciting the accounts of other DuPont Jobbers.  (ECF No. 348-25; Fallows Dep. at 251-52.)  Fallows and Garcia investigated Choice's complaints about Metro poaching customers, and asked Metro to change its practices.  (Garcia Dep. at 246-48.)  DuPont also asked Metro to relocate out of Colorado an employee who was involved with attempting to poach a customer from Choice.  (Jacobson Dep. at 148-50.)  Metro admits that it did not follow the procedures DuPont attempted to implement.  (Jacobson Dep. at 317-18.)

Although DuPont informed Choice that Metro would be penalized under the Champion Program for soliciting Choice's customers, DuPont's investigation revealed that only two of Choice's customers had been improperly poached from Choice by Metro.  (Garcia Dep. at 108.)  DuPont did not penalize Metro for one of these accounts because Metro represented that the amount of the discount it offered to the customer was a clerical error rather than a deliberate attempt to poach a customer.  (Garcia Dep. at 153-54.)  DuPont took Metro at its word.  (*Id*.)  For the other account, DuPont withheld the credit to Metro's Champion Program account in accordance with the Program contract.  (*Id*. at 246-48.)  DuPont did not classify the other customers who

6

switched from Choice to Metro as poachers because DuPont's investigation revealed that they switched to Metro based on the customer's dissatisfaction with Choice. (Fallows Dep. at 173, Small Dep. at 97-98.)

While DuPont was undisputedly giving substantial financial assistance to Metro while it was entering the Denver market, DuPont also took steps to help Choice with its business.  On five occasions between August 2009 and March 2011, DuPont provided Choice and/or its customers with over $500,000 in loans and credits, as part of an attempt to help Choice maintain and add to its customer base.  (J. Schweid Dep. at 236, 247-65.)  DuPont also offered Choice a "special promotional buying opportunity" which resulted in Choice being provided approximately $125,000 in additional Empowerment Dollars between February 2009 and July 2010.  (Small Decl. ¶ 9.)  On two instances, DuPont voluntarily continued to credit Choice for sales made to transferred accounts for purposes of the growth calculation for the Program.  (Garcia Dep. at 153-54.)  Finally, DuPont reimbursed Choice for $57,500 in incentive payments that Choice paid its customers to keep them from switching to Metro.[2]  (Small Dep. at 188-90; Small Decl. ¶ 10.)

At the same time Choice was competing with Metro in the sale of DuPont automotive coatings, it was also competing with other manufacturers of automotive coatings.  PPG and Sikkens were offering aggressive discounts, which caused Choice to fear losing business to these manufacturers.  (J. Schweid Dep. at 149-51; ECF Nos. 347-38 & 347-39.)  In fact, Choice lost four accounts to PPG between June 2009 and

---

[2]  DuPont was not required to, and has never before, compensated a Jobber for monies paid to retain a customer.  (Small Dep. at 48.)

April 2011.  (S. Schweid Dep. at 114-18, 126-30.)  Choice also lost customers to Sikken and Sherwin Williams.  (*Id*. at 103-111.)  During this time period, Choice lost more accounts to competitive paint lines than it did to Metro.  (ECF No. 348 at 21.)

Overall, DuPont's research shows that its share of the Denver market for automotive refinish paint peaked in the second quarter of 2009; Metro entered the market in the first quarter of that year.  (Small Decl. ¶ 8 & att. A.)  DuPont's market share then declined, falling to as low as sixteen percent in the second quarter of 2010.  (*Id*.)  Since 2011, DuPont has maintained a relatively steady market share around 20%.  (*Id*.)

In spring 2011, Choice decided that it needed to get out of the Jobber business while its company still had value.  (Cuthbertson Dep. at 150-53; J. Shweid Dep. at 255-56.)  Choice sold most of its assets to National Coatings and Supplies, Inc. in June 2011.  (J. Schweid Dep. at 346.)  It then filed this action in December 2011.  (ECF No. 1.)

### III.  ANALYSIS

Plaintiff's Second Amended Complaint brings ten claims against Defendant, which can be categorized as follows: (1) seven antitrust claims under the Sherman Act, the Clayton Act, and the Colorado Antitrust Act of 1992; (2) one claim for violation of the Colorado Consumer Protection Act; (3) one claim for common law fraud; and (4) one claim for common law breach of the duty of good faith and fair dealing.  (SAC pp. 17-28.)  Defendant moves for summary judgment on all claims against it.  (ECF No. 348.)  Plaintiff moves for affirmative summary judgment only on the claims for common law fraud and breach of the implied covenant of good faith and fair dealing.  (ECF No. 350.)  The Court will discuss each category of claims in turn below.

A.      **Antitrust Claims**

In its antitrust claims, Plaintiff alleges that Defendant violated § 1 of the Sherman

Act and § 3 of the Clayton Act by unlawfully restraining competition between its

Jobbers.  (SAC pp. 17-22.)  Plaintiff also alleges that Defendant violated § 2 of the

Sherman Act and the analogous Colorado Antitrust Act[3] (specifically Colo. Rev. Stat. §

6-4-104) by attempting to monopolize and conspiring to monopolize the Colorado

market for automotive coatings.  (*Id*. at 22-24.)

A necessary element of any antitrust claim is an antitrust injury.  *See NYNEX

Corp. v. Discon*, 525 U.S. 1278, 135 (1998) (a plaintiff in a § 1 claim must show harm to

the competitive process); *Rural Tele. Serv. Co., Inc. v. Feist*, 957 F.2d 765, 768 (10th

Cir. 1992) (holding that an antitrust injury is a necessary element of a § 2 claim); *Full

Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745, 750 (10th Cir. 1999) (claim under the

Clayton Act requires that the plaintiff show an antitrust injury).  "An antitrust injury is

defined as an injury of the type the antitrust laws were intended to prevent and that

flows from that which makes defendants' acts unlawful."  *Sports Racing Servs., Inc. v.

Sports Car Club of Am., Inc.*, 131 F.3d 874, 882 (10th Cir. 1997).

Defendant contends that summary judgment is appropriate on all of Plaintiff's

antitrust claims because Plaintiff has failed to show an antitrust injury.  (ECF No. 348 at

22.)  Defendant argues that its actions—including the incentives offered by Metro to

---

[3] Colorado's antitrust statute generally tracks the provisions of federal law.  *See People
v. N. Ave. Furniture & Appliance, Inc.*, 645 P.2d 1291, 1295-96 (Colo. 1982) (looking to federal
law interpreting the Sherman Act and the Clayton Act for guidance).  Accordingly, the Court will
discuss only the federal claims, and its analysis applies equally to the claims brought under the
Colorado statutes.

lure customers away from Choice—resulted in lower prices to consumers, which is what the antitrust statutes were designed to encourage rather than prevent. (*Id*. at 23-25.)

First, the Court notes that Plaintiff does not respond directly to this argument. Plaintiff instead recites a litany of ways that Defendant allegedly wronged it. (ECF No. 370 at 26-30.) Plaintiff's failure to respond to Defendant's argument on this point with any level of precision is reason enough to grant summary judgment in Defendant's favor. *See Cross v. The Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) ("[O]n a motion for summary judgment, 'it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without depending on the trial court to conduct its own search of the record.'"). However, despite Plaintiff's deficient briefing, the Court has attempted to glean the alleged antitrust injury asserted in this case.

Plaintiff contends that it was injured by Defendant's actions because it lost six accounts in less than two years. (ECF No. 370 at 30.) Plaintiff alleges that Defendant caused this harm because Metro was only able to offer such deep discounts to customers due to Defendant's financial assistance provided and additional Empowerment Dollars awarded to Metro. (*Id*.)

The Court finds that Plaintiff's loss of accounts to Metro does not constitute an antitrust injury. It is well established that "[w]hether a practice violates the antitrust laws is determined by its effect on competition, not its effect on an individual competitor." *Bright v. Moss Ambulance Serv., Inc.*, 824 F.2d 819, 824 (10th Cir. 1987); *see also Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488 (1977) (antitrust laws were enacted to protect competition, not to protect competitors). The record shows that customers switched to Metro either because they were dissatisfied with Plaintiff's

service, or because Metro offered deeper discounts, or both.  The discounts offered by

Metro resulted in lower prices for the consumer, which is what the antitrust statutes are

designed to encourage.  *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 351 n.8

(1990) (a competitior's independent decision to reduce prices are "precisely what the

antitrust laws are intended to encourage.").  So long as a rival's lower prices do not fall

below cost[4], offering deep discounts to customers is not anticompetitive and does not

harm the consumer.  *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509

U.S. 209, 223 (1993) ("Low prices benefit consumers regardless of how they are set,

and so long as they are above predatory levels, they do not threaten competition.")

Thus, the fact that Plaintiff lost accounts to Metro—its competitor in the Colorado

market—does not show an antitrust injury.  *See Paladin Assocs., Inc. v. Mont. Power

Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003) ("Where the defendant's conduct harms the

plaintiff without adversely affecting competition generally, there is no antitrust injury.").

    Plaintiff also alleges, without citation to the record, that customers were harmed

by Defendant's failure to more closely police Metro's actions because Metro offered

lower prices only to those customers that it was attempting to poach from Choice.  (ECF

No. 370 at 30.)  Initially, the Court questions how Metro's pricing structure is attributable

to DuPont for purposes of showing that DuPont caused an anticompetitive injury.

However, to the extent it could be argued that Metro's pricing decisions were caused by

DuPont, Plaintiff cites no law requiring a distributor to offer the same pricing scheme to

each of its customers.  In fact, courts regularly approve of different pricing structures

---

[4] There is no evidence in the record that Metro priced its products below cost or
engaged in any type of predatory pricing scheme.

11

based on incentive or rebate programs.  *See Comcoa, Inc. v. NEC Tels., Inc.*, 931 F.2d 655, 664 (10th Cir. 1991) (approving of jury instruction stating that "[t]he implementation of a discount program need not guarantee that all customers benefit to the same degree as other customers"); *Smith Wholesale Co., Inc. v. R.J. Reynolds*, 477 F.3d 854, 866 (6th Cir. 2007) ("Indeed, by definition, an incentive-based program will lead to different outcomes for different purchasers.").

Finally, Plaintiff contends that, because Defendant would not allow any Jobber who sold a competitor's product to participate in the Program, customers were denied the opportunity to have their DuPont Jobbers sell them a competitor's product.  (ECF No. 370 at 30.)  However, taking this allegation as true, DuPont prevented a customer from buying a competitor's product only from a particular Jobber.  Plaintiff does not allege that consumers were denied the ability to purchase competitor's products altogether, or that Defendant's actions impaired the overall competitive market. Manufacturers have wide latitude to limit distribution of their products, and to require that distributors sell their products exclusively.  *Westman Commc'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1225 (10th Cir. 1986).

Rather than having anticompetitive effects, the evidence shows a robust market in the Denver area in automotive coatings both before and after Metro acquired DCC. (*See* ECF Nos. 348-5, 347-37, 347-38 & 347-39.)  At its peak, DuPont had less than forty percent of the Denver market share.  (Small Decl. ¶ 8 & att. A.)  Although DuPont's market share crested shortly after Metro entered the market, it has since significantly declined.  (*Id*.)  In fact, during the time Plaintiff was competing with Metro to sell

DuPont's products, Plaintiff was also competing with other manufacturers and actually lost more accounts to competing manufacturers than it did to Metro. (ECF No. 348 at 21.)  Regardless of how Defendant's actions may have harmed Plaintiff, there is no evidence that Defendant harmed the overall market for automotive coatings.

Antitrust laws were not intended to protect a particular distributor; they protect the public and overall inter-brand competition. *State Oil*, 522 U.S. at 15 ("[T]he primary purpose of the antitrust laws is to protect interbrand competition.").  Plaintiff here bears the burden of showing that Defendant's actions harmed inter-brand competition in a manner that constitutes an antitrust injury.  It has not done so.  As such, summary judgment in favor of Defendant is appropriate on all of Plaintiff's antitrust claims.[5]

## B.     Common Law Fraud

Plaintiff alleges that Defendant engaged in fraud by consistently claiming that DuPont had no financial interest in Metro's success in the Denver market, and that it was taking appropriate steps to stop Metro from poaching Plaintiff's customers.  (SAC ¶¶ 116-120.)  The parties have filed cross-motions for summary judgment on this claim. (ECF No. 348 at 36; ECF No. 350 at 22.)

To establish fraud under Colorado law, a plaintiff must show: (1) that the defendant made a false representation of a material fact; (2) that the Defendant knew

---

[5]  The Court also agrees with Defendant's argument that Plaintiff has failed to introduce sufficient evidence of a relevant market, which is necessary to meet its summary judgment burden on its antitrust claims (except for the conspiracy to monopolize claim under § 2 of the Sherman Act).  (*See* ECF No. 348 at 28.)  Plaintiff has failed to offer any expert testimony on the relevant market, and its fact evidence is inconsistent as to the appropriate geographical boundaries of the relevant market.  (*See* ECF No. 348 at 29-30.)  Plaintiff's failure to meet this burden is an alternate reason to grant summary judgment on the majority of Plaintiff's antitrust claims.

that representation to be false; (3) that the person to whom the representation was made was ignorant of the falsity; (4) that the representation was made with the intention that it be acted upon; and (5) that the reliance resulted in damage to the plaintiff.  *Coors v. Security Life of Denver Ins. Co.*, 112 P.3d 59, 66 (Colo. 2005).

Defendant contends that summary judgment in its favor is appropriate because Plaintiff cannot show that it made any knowingly false representations.  In support of its Motion, Plaintiff contends that Defendant's regional sales managers—Fallows and Garcia—repeatedly made false statements about two issues: (1) DuPont's financial support of Metro; and (2) DuPont's intent to assist Plaintiff with retaining its existing customers.  The Court will address each category of statements below.

1.   DuPont's Financial Assistance to Metro

Plaintiff contends that Mr. Fallows repeatedly told it that:  (1) DuPont did not know where Metro was getting the money to fund its discounts; (2) the money did not come from DuPont; and (3) Metro was not getting anything that Plaintiff was not also getting.  (ECF No. 350 at 25.)  Defendant admits that these statements were false in that DuPont guaranteed Metro's $1,600,000 loan needed to acquire DCC and covered quarterly interest payments of $12,500.00.  (ECF No. 350 ¶¶ 48-49.)  DuPont also admits that it gave Metro $500,000 in free product to be used for Metro's equipment and inventory in the Colorado market, and supplied Metro an additional $300,000 in Empowerment Dollars through the Champion Program.  (*Id*. ¶¶ 51-53.)

Defendant contends, however, that Plaintiff has not shown that Mr. Fallows made these statements with knowledge or reckless indifference to their falsity.  (ECF No. 373 at 31.)  Plaintiff admits that Mr. Fallows was not aware that DuPont had

guaranteed Metro's loan or that DuPont's senior executives were supplying Metro with additional funds.  (ECF No. 350 ¶ 55 ("At no time relevant to the Second Amended Complaint, did any of DuPont's national managers inform the Colorado District Managers that Metro had received any financial support from DuPont in connection with Metro's acquisition of DCC.").)  Plaintiff has thereby admitted that Mr. Fallows did not know that the statements he was making were false.

Citing a case issued by the Colorado Supreme Court more than seventy years ago, Plaintiff argues that whether the speaker knows the statement is false is immaterial, and contends that the only requirement to show fraud is that the statement is actually false.  (ECF No. 350 at 23 (citing *Pattridge v. Youmans*, 109 P.2d 646, 648 (Colo. 1941).)  This argument is unavailing because it ignores more recent proclamations of the Colorado Supreme Court which require that a misrepresentation, to be actionable as fraud, be "made 'either with knowledge of its untruth, or reckless and wilfully . . . without regard to its consequences, and with an intent to mislead and deceive the plaintiff.'"  *Brodeur v. Am. Home Assurance Co.*, 169 P.3d 139, 153 (Colo. 2007) (quoting *Rhino Linings USA, Inc. v. Rocky Mtn. Rhino Lining, Inc.*, 62 P.3d 142, 147 (Colo. 2003)).

Thus, the only remaining issue is whether Mr. Fallows's false statements were made recklessly.  Plaintiff argues that DuPont's national managers knew of the financial assistance that was provided to Metro and, because DuPont is liable for the knowledge of its agents, the corporation knew that Mr. Fallows's statements were false, which is sufficient for a fraud claim.  (ECF No. 395 at 19.)  While it is true that a corporation is generally liable for the knowledge of any agent acting within the scope of his

15

employment, *see W. Diversified Servs., Inc. v. Hyundai Motor Am., Inc.*, 427 F.3d 1269, 1276 (10th Cir. 2005), the reverse is not true.  That is, an agent is not generally charged with knowledge of everything that a corporation knows, particularly when that agent is not an officer or executive of the corporation.  *See Clear One Comm'ns, Inc. v. Nat'l Union*, 494 F.3d 1238, 1249 (10th Cir. 2007) (finding that a corporate director was not held to have knowledge of the corporation's misstatements on its 10-K because it fell outside of her area of expertise).  To succeed on a fraud claim, a plaintiff must show that the individual who made the false statement knew it was false or was recklessly indifferent to the falsity of his comments; it is not enough to show that the statement was false based upon all of the knowledge imputed to a corporation.  *See Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 513 F.3d 702, 708 (7th Cir. 2008) (with regard to a knowingly false statement, a plaintiff cannot "attribute to a corporation a state of mind that none of its employees had.").

Mr. Fallows was a regional sales manager who undisputedly did not know that DuPont's national managers were offering financial support to Metro.  There is no evidence that Mr. Fallows should have been informed of this fact, or should have had reason to inquire into the financial arrangements the national sales managers had made with Metro.  Therefore, no reasonable juror could find that Mr. Fallows made a knowingly false statement, or that he was recklessly indifferent as to the falsity of his statements.  *See In re Johnson*, 477 B.R. 156, 172 (10th Cir. 2012) ("Lacking an awareness that he is deceiving the other party, either about the fact itself or about his confidence in his knowledge of the fact, he cannot possess an intent to deceive.").

2.    DuPont's Assistance to Plaintiff

Plaintiff alleges that both Mr. Fallows and Mr. Garcia repeatedly informed it that they would do everything in their power to ensure that Plaintiff was treated "fairly" when Metro entered the Colorado market, that they would not permit Metro to solicit Plaintiff's business, and that they would not do anything to give Metro a competitive advantage. (ECF No. 350 at 26.)  Defendant argues that these statements cannot form the basis for a fraud claim because Plaintiff cannot show that, at the time the statements were made, Mr. Fallows and Mr. Garcia did not intend to take these actions.  (ECF No. 373 at 28-29.)

In Colorado, a promise to do something in the future is not actionable "[u]nless the speaker making the representations deliberately falsified his or her intention to induce reliance." *Nelson v. Gas Research Inst.*, 121 P.3d 340, 343 (Colo. Ct. App. 2005). Plaintiff has failed to point to any evidence showing that, at the time the disputed statements were made, Messrs. Fallows and Garcia did not intend to fulfill the promises that they made to Plaintiff regarding their future conduct.  Moreover, there is significant evidence in the record showing that Messrs. Fallows and Garcia actually took steps to assist Plaintiff with retaining its customers.  As part of an attempt to help Choice maintain and add to its customer base, DuPont offered Plaintiff over $500,000 in loans and credits for customers, gave Plaintiff approximately $125,000 additional Empowerment Dollars, and reimbursed Plaintiff $57,500 in incentive payments that Plaintiff made to its customers to keep them from switching to Metro.  (J. Schweid Dep. at 236, 247-65; Small Decl. ¶¶ 9-10.)

Although DuPont's national managers may have been taking other actions that assisted Metro, there is no evidence that the individuals who made the promises to

17

Plaintiff—Messrs. Fallows and Garcia—acted in a manner contrary to their promises, and there is certainly no evidence that they intended not to follow through with the promises at the time they were made.  As such, these statements cannot form the basis of Plaintiff's fraud claim.  *See State Bank v. States*, 723 P.2d 159, 160 (Colo. App. 1986) (fraud requires more than the mere nonperformance of a promise or the failure to fulfill an agreement to do something at a future time).

In sum, the Court finds that Plaintiff has failed to show a genuine dispute of fact as to whether Defendant or its agents made any knowingly false statements, and has therefore failed to meet its summary judgment burden on the fraud claim.  Accordingly, Plaintiff's Motion for Summary Judgment is denied as to this claim, and Defendant's Motion for Summary Judgment is granted.

**C.    Breach of the Duty of Good Faith and Fair Dealing**

Plaintiff alleges that Defendant breached its duty of good faith and fair dealing with regard to its contract for participation in Defendant's Program ("Champion Contract").  (SAC ¶¶ 121-132.)  The parties have filed cross-motions for summary judgment on this claim.  (ECF No. 342 at 36; ECF No. 350 at 28.)

Defendant first argues that the Champion Contract does not have an implied duty of good faith and fair dealing because it is an at-will contract.  (ECF No. 348 at 36-37.)  Plaintiff disputes this fact, arguing both that the Champion Contract is not at-will, and that the duty of good faith and fair dealing is implied into every contract, regardless of the at-will status.  (ECF No. 370 at 35.)  The Court need not resolve this dispute because, even if it assumes that the Champion Contract contains an implied duty of good faith and fair dealing, Plaintiff has not shown a dispute of fact as to whether

18

Defendant breached that duty.

Although both parties have argued this claim under Colorado law, because the Champion Contract is governed by Delaware law (*see* ECF No. 350-11 at 6), the Court will rely on the Delaware law for its analysis.  In Delaware, the implied covenant of good faith and fair dealing "involves a 'cautious enterprise,' inferring contractual terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated."  *Nemec v. Shrader*, 991 A.2d 1120, 1125 (Del. 2010) (quoting *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 441 (Del. 2005)).  "[O]ne generally cannot base a claim for breach of the implied covenant on conduct authorized by the agreement."  *Dunlap*, 878 A.2d at 441.  The Court may only imply contract terms when the plaintiff proves that the defendant has acted arbitrarily or unreasonably, and has thereby frustrated the fruits of the bargain that plaintiff reasonably expected.  *Id*. at 442. The Court may not "rewrite the contract to appease a party who later wishes to rewrite a contract he now believes to have been a bad deal.  Parties have a right to enter into good and bad contracts, the law enforces both."  *Nemec*, 991 A.3d at 1126.

Plaintiff alleges that Defendant breached its duty of good faith and fair dealing by not treating Choice and Metro equally with regard to access to Empowerment Dollars. (ECF No. 350 at 30.)  However, there is no provision in the Contract that requires Defendant to give each Jobber an equal amount of Empowerment Dollars.  In fact, the Champion Program is an *incentive* program, under which the amount of Empowerment Dollars is determined, in part, by a Jobber's sales.  Thus, the explicit terms of the Champion Contract permit Defendant to treat the various Jobbers differently.  As such,

the fact that Metro had access to more Empowerment Dollars than Plaintiff was not, in and of itself, a breach of the duty of good faith and fair dealing.  *See Dunlap*, 878 A.2d at 441 ("[O]ne cannot generally base a claim for breach of the implied covenant on conduct authorized by the terms oft eh agreement.").

Plaintiff also alleges that Defendant violated the duty of good faith by selecting Metro to purchase DCC, with knowledge of Metro's aggressive sales tactics.  (ECF No. 350 at 30.)  The Champion Contract provides that DuPont retains the discretion to decide whether it will permit any buyer of an existing Jobber to sell its products, and to decide whether that buyer will be permitted to participate in the Champion Program. (*See* ECF No. 350-11 at 4.)  But there is no implied, and certainly no express, provision in the Champion Contract that requires DuPont to only approve buyers that will not increase competition for the existing Jobbers.  In fact, one of the express purposes of the Champion Program is to provide Jobbers with an incentive to sell more DuPont products, and to increase overall sales of DuPont products.  (ECF No. 350-11 at 5 (stating "[o]ne of the primary purposes of the Program is to increase the sale of DuPont Performance Coatings products.").)  Thus, the parties understood that DuPont's intent was to increase sales of its products when they entered into the Champion Contract, and Defendant's choice of an aggressive buyer for DCC furthers that goal.  As such, Plaintiff has failed to show how Defendant violated any duty of good faith and fair dealing by selecting a buyer that was known to employ aggressive sales tactics.  *See Dunlap*, 878 A.2d at 441 (covenant of good faith and fair dealing cannot be used to "create a 'free-floating duty . . . unattached to the underlying legal document.'") (quoting *Glenfed Fin. Corp. v. Penick Corp.*, 647 A.2d 852, 858 (N.J. 1994)).

Finally, Plaintiff alleges that the implied covenant of good faith and fair dealing was violated when Defendant failed to take appropriate steps to stop Metro from poaching Plaintiff's existing customers.  (ECF No. 350 at 31.)  In support of this argument, Plaintiff points to the provision in the Champion Contract which states:

> As a condition of participation in this Program, Jobbers may not actively solicit or cause to be transferred the business of a customer who purchases DuPont Performance Coatings from another DuPont Jobber.  Jobbers who transfer the business of an existing DuPont Performance Coatings customer shall for purposes of the growth calculation on the Jobber Scorecard (as more fully described in the Champion Rules) have their credit for purchases reduced by the value of the transferred account.

(ECF No. 350-11 at 5.)  Plaintiff argues that, by way of this provision, Defendant "clearly promised" Plaintiff that it will not permit Jobbers who solicit accounts from other Jobbers to participate in the Program, and that it will not give credit to Jobbers who transfer accounts from other Jobbers.  (*Id*. at 14.)

The Court finds that the contractual provision cited by Plaintiff above shows only that Defendant intended to take certain actions against Plaintiff if Plaintiff was found to be soliciting existing customers from another DuPont Jobber.  The Court fails to see how, by way of this provision, DuPont made promises to Plaintiff with regard to how it would interact with other Jobbers.  The implied duty of good faith and fair dealing only binds the parties to the contract.  *Gerber v. Enter. Prods. Holdings, LLC*, 67 A.3d 400, 421 (Del. 2013).  Plaintiff does not allege that Defendant treated it improperly under the Champion Contract by, for example, wrongfully determining that it had poached another customer or improperly reducing Plaintiff's growth calculation.

21

Instead, Plaintiff's argument is based solely on how Defendant acted towards Metro.  As Defendant points out, Plaintiff has not shown that it is an intended third-party beneficiary of the contract between Defendant and Metro.  (ECF No. 373 at 25.)  As such, Plaintiff cannot attempt to enforce the provisions of that agreement.  *See Insituform of N. Am. v. Chandler*, 534 A.2d 257, 268 (Del. 1987) ("[S]trangers to a contract ordinarily acquire no rights under it unless it is the intention of the promisee to confer a benefit upon such third party.").  That is, Plaintiff cannot show that Defendant breached the covenant of good faith and fair dealing it owed to Plaintiff by failing to enforce the terms of its contract with Metro.  Thus, Plaintiff has failed to show any violation of the covenant of good faith and fair dealing implied into its Champion Contract with Defendant.

In sum, it is clear that the party who acted in bad faith in this case was undisputedly Metro, against whom Plaintiff has already settled its claims.  (ECF No. 357.)  While Plaintiff obviously wishes that Defendant had done more to intervene, Plaintiff has not shown a genuine dispute of fact as to whether Defendant was legally or contractually obligated to take any additional action to stop or curtail Metro's aggressive sales tactics, or that Defendant's alleged inaction violated the duty of good faith and fair dealing.  Accordingly, with respect to the claim of breach of the duty of good faith and fair dealing, Defendant's Motion for Summary Judgment is granted and Plaintiff's Motion for Partial Summary Judgment is denied.

## D.     Colorado Consumer Protection Act Claim

Defendant moves for summary judgment on Plaintiff's claim brought under the Colorado Consumer Protection Act ("CCPA"), arguing that Plaintiff has failed to show a

harm to the public.  (ECF No. 348 at 38.)  Defendant contends that the only harm alleged by Plaintiff is private in nature, and that the CCPA does not protect against private harms.  (*Id*.)  Plaintiff's entire response to this argument is as follows: "For all of the reasons set forth in Section II above [referencing discussion of fraud claim], JTS has a colorable claim for violation of the CCPA, and DuPont's Motion should be denied."  (ECF No. 370 at 38.)

As the party bearing the burden of persuasion at trial, Plaintiff bears the burden on summary judgment of showing a genuine dispute of fact as to each element of its claims.  *See Cross*, 390 F.3d at 1290.  Plaintiff has utterly failed to meet this burden. Plaintiff fails to discuss any of the elements of Colo. Rev. Stat. § 6-1-105, or to demonstrate which facts are in dispute with regard to this claim.  Plaintiff also completely fails to respond to Defendant's argument that Plaintiff is required to show a public harm in order to succeed on its CCPA claim.  *See Rhino Linings USA, Inc. v. Rocky Mtn. Rhino Lining, Inc.*, 62 P.3d 142, 149 (Colo. 2003) (CCPA requires that a plaintiff prove significant public impact).  Because Plaintiff has devoted so little time and energy to analyzing this claim, the Court will do likewise.  Defendant's Motion for Summary Judgment is granted as to Plaintiff's CCPA claim.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.     Plaintiff's Motion for Partial Summary Judgment (ECF Nos. 352) is DENIED;

2.     Defendant's Motion for Summary Judgment (ECF Nos. 347 & 353) is GRANTED;

3.      The Court is aware that Defendant's Amended Counterclaim (ECF No. 174) is

still pending, as well as Plaintiff's Motion for Summary Judgment (ECF No. 413)

on that Counterclaim.  The Court will address these matters in due course.

Dated this 26th day of February, 2014.

BY THE COURT:

_____

William J. Martinez
United States District Judge